NOAH G. BLECHMAN (State Bar No. 197167)
Noah.Blechman@mcnamaralaw.com
JOHN J. SWAFFORD (State Bar No. 321174)
John.Swafford@McNamaraLaw.com
McNAMARA, AMBACHER, WHEELER,
HIRSIG & GRAY LLP
3480 Buskirk Avenue, Suite 250
Pleasant Hill, CA 94523
Telephone: (925) 939-5330
Facsimile: (925) 939-0203

Attorneys for Defendants
CITY OF PITTSBURG; BRIAN ADDINGTON;
WILLIAM HATCHER; CORY SMITH and
PATRICK WENTZ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHTON PORTER, individually,

Plaintiffs,

vs.

CITY OF PITTSBURG, a municipal corporation; BRIAN ADDINGTON, in his individual capacity as a law enforcement officer for the PITTSBURG POLICE DEPARTMENT; ERNESTO MEJIA-OROZCO, in his individual capacity as a law enforcement officer for the PITTSBURG POLICE DEPARTMENT; WILLIAM HATCHER, in his individual capacity as a law enforcement officer for the PITTSBURG POLICE DEPARTMENT; CORY SMITH, in his individual capacity as a law enforcement officer for the PITTSBURG POLICE DEPARTMENT; and DOES 1-50, inclusive,

Defendants.

Case No. C24-03179 MMC

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT / PARTIAL SUMMARY JUDGMENT**

Date: August 28, 2026
Time: 9:00 A.M.
Dept: Courtroom 7-19th Floor
Judge: Hon. Judge Maxine M. Chesney

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

**TABLE OF CONTENTS**

I. INTRODUCTION ........ 1

II. RELEVANT FACTS ........ 2

A. Initial Calls for Police to the Hotel ........ 2

B. Prolonged Additional Negotiations Failed to Get Porter to Come Out ........ 4

C. SWAT Team Activated for Assistance ........ 4

D. Continued Negotiations With SWAT Team Providing Support ........ 7

E. Porter Flushed Out of Room and Presents Deadly Threat ........ 11

F. Post-Shooting Investigation ........ 12

G. Opinions by Relevant Experts ........ 13

III. LEGAL STANDARDS ........ 15

1. Summary Judgment Standards ........ 15

2. Qualified Immunity Standards ........ 17

IV. LEGAL ARGUMENTS ........ 18

A. Ofc. Mejia's Use of Deadly Force Did Not Violate the Fourth Amendment and/or Qualified Immunity Applies ........ 18

a. Nature and Quality of Intrusion ........ 19

b. Government Interests are Satisfied (*Graham* factors) ........ 20

c. Qualified Immunity Protects Ofc. Mejia At a Minimum ........ 22

B. Plaintiff's Supervisory Claims Fail and/or Qualified Immunity Applies ........ 24

C. Plaintiff's *Monell* Failure to Supervise Claim Also Fails ........ 25

D. Plaintiff's ADA Claim Against the City Fails As Well ........ 26

E. Plaintiff's State Claims Are Also Subject to Summary Judgment ........ 27

1. Plaintiff's Bane Act Claim Fails ........ 27

2. Plaintiff's Negligence Claim Is Wholly Unsupported ........ 28

3. Plaintiff's Battery Claim Also Fails ........ 29

4. Immunities Protect From Claims Per State Law ........ 30

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

# TABLE OF AUTHORITIES

**Cases**

*American International Group, Inc., v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991) .......... 16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986) .......... 15, 16

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) .......... 17, 18

*Ashcroft v. Iqbal*, 556 U.S. 662, 675-77 (2009) .......... 24

*Austin B. v. Escondido Unified Sch. Dist.*, 149 Cal.App. 4th 860, 880-81 (2007) .......... 27, 28

*Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991) .......... 16

*Blanford v. Sacramento County*, 406 F.3d 1110, 1115–19 (9th Cir. 2005) .......... 22

*Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) .......... 17, 18

*Brown v. Ransweiler*, 171 Cal. App. 4th 516, 528 (2009) .......... 28

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23(1986) .......... 15, 16

*City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600 (2015) .......... 20, 26

*City of Escondido v. Emmons*, 586 U.S. 38, 42–43 (2019) .......... 25

*City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) .......... 25

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) .......... 15

*Connick v. Thompson*, 563 U.S. 51, 61–63 (2011) .......... 26

*Cornell v. City & County of San Francisco* (2017) 17 Cal.App.5th 766, 790-804 .......... 27

*Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014) .......... 19

*Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272 (1998) .......... 28, 29

*Elliot v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996) .......... 21

*Espinosa v. City & County of San Francisco*, 598 F. 3d 528, 537 (9th Cir. 2010) .......... 21

*Estate of Toribio v. City of Santa Rosa*, 381 F. Supp. 3d 1179, 1187 (N.D. Cal. 2019) .......... 19

*Felarca v. Birgeneau*, 891 F.3d 809, 823 (9th Cir. 2018) .......... 24

*First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968) .......... 15

*Franklin v. Fox*, 312 F.3d 423, 437 (9th Cir. 2002) .......... 17

*George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013 .......... 19, 20

*Gonzales v. City of Antioch*, No. 14-cv-04728-KAW, 2015 U.S. Dist. LEXIS 142642, at *37 (N.D. Cal. Oct. 20, 2015) ........ 21

*Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) ........ 20

*Graham v. Connor*, 490 U.S. 386, 395-96 (1989) ........ passim

*Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) ........ 28

*Harb v. City of Bakersfield*, 233 Cal. App. 4th 606, 620 (1974) ........ 30

*Hart v. City of Redwood City* 99 F.4th 543, 546 (9th Cir. 2024) ........ 22

*Hayes v. Cty. Of San Diego*, 57 Cal. 4th 622, 639 (2013 ........ 28, 29

*Hooper v. City of Chula Vista*, 212 Cal. App. 3d 442 (1989) ........ 30

*Hyer v. City & County of Honolulu*, 118 F.4th 1044, 1065 (9th Cir. 2024) ........ 26, 27

*J.A.L. v. Santos*, 724 F.Appx. 531, 534 (9th Cir. 2018 ........ 28

*Jeffers v. Gomez*, 267 F. 3d 895, 909 (9th Cir. 2001) ........ 23

*Johnson v. Barr*, 2021 U.S. Dist. LEXIS 183685 at *23 (N.D. Cal. Aug. 24, 2021) ........ 16

*Jones v. Kmart Corp.*, (1998) 17 Cal.4th 329, 334) ........ 28

*Kisbey v. State of California*, 36 Cal. 3d 415 (1984) ........ 30

*Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) ........ 17, 22

*Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917 (1996) ........ 28

*Lal v. California*, 746 F.3d 1112, 1117-1119 (9th Cir. 2014) ........ 22

*Lees v. Mariscal*, 2022 U.S. Dist. LEXIS 178003, at *22 (N.D. Cal. Sep. 29, 2022) ........ 16

*Lynn v. Sheet Metal Workers Int'l Ass'n*, 804 F.2d 1472, 1478 (9th Cir. 1986) ........ 15

*M.H. v. City of Alameda*, 62 F. Supp. 3d 1049, 1093-94 (N.D. Cal. 2014) ........ 18

*Malley v. Briggs*¸475 U.S. 335, 341 (1986) ........ 18

*Marquez v. City of Phoenix*, 693 F.3d 1167, 1174 (9th Cir. 2012) ........ 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ........ 15

*Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) ........ 18

*Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ........ 18

*Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978) ........ 2, 25

*Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) ........ 17

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

*Mullenix v. Luna*, 136 S. Ct. at 308 (2015), ........ 18

*Napouk v. Las Vegas Metropolitan Police Department*, 123 F.4th 906, 918 (9th Cir. 2024) ....... 22

*Nelson v. City of Davis*, 709 F.Supp.2d 978, 992 (E.D. Cal. 2010)........ 29

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000)........ 16

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ........ 18

*Puente v. City of Phoenix*, 123 F.4th 1035, 1064 (9th Cir. 2024)........ 24

*Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1044-45 (9th Cir. 2018) ........ 27

*Rivas-Villegas v. Cortesluna*, 595 U.S. at 5-6 (2021)........ 23

*S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017)........ 20, 22

*Sabbe v. Washington County Board of Commissioners*, 2023 U.S. App. LEXIS 27553 *43-44 (9th Cir. 2023) ........ 20

*Saucier v. Katz*, 533 U.S. 194, 205 (2001)........ 17, 18

*Scott v. Harris*, 550 U.S. 372, 378 (2007) ........ 17

*Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1992)........ 18

*Sheehan v. City & County of San Francisco (Sheehan I)*, 743 F.3d 1211, 1232 (9th Cir. 2014) . 22, 23, 26, 27

*Smith v. City of Hemet*, 394 F. 3d 689, 700 (9th Cir. 2005)........ 18, 19

*Smith v. Cnty. Of Butte*, U.S. District LEXIS 65335 *5 (E.D. Cal. 2017)........ 29

*Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011) ........ 24

*Sullivan v. County of L.A.*, 12 Cal. 3d 710, 717, (1974) ........ 30

*T.W. Elec. Serv., Inc. v. Pacific Elec, Contractor Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)........ 15

*Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125 (9th Cir. 2021)........ 28

*Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ........ 16

*Tennessee v. Garner*, 471 U.S. 1, 8 (1985)........ 19

*Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979) ........ 16

*Tolan v. Cotton*, 572 U.S. 650, 656 (2014)........ 16

*Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008)........ 17

*Trevino v. Gates*, 99 F.3d 911, 917–18 (9th Cir. 1996) ........ 26

*United States v. Place*, 462 U.S. 696, 703 (1983)........ 19

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

*Vazquez v. County of Kern*, 949 F.3d 1153, 1166 (9th Cir. 2020)........ 24
*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)........ 15
*Vos. v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018) ........ 19
*White v. Pauly,* 137 S.Ct. 548, 551 (2017)........ 17
*Wilkinson v. Torres*, 610 F. 3d 546, 551 (9th Cir. 2010) ........ 23
*Zorn v. Linton*, 146 S. Ct. 926, 930-31 (2026)........ 23

**Statutes**

California Civil Code § 52.1 ........ 27
Federal Rules Civil Procedure § 56 ........ 15
Gov. Code § 815.2 ........ 30
Gov. Code § 820.4 ........ 30
Gov. Code § 845.8(b)........ 30
Penal Code § 594(b)(1) ........ 3
Penal Code § 602(o)........ 3
Penal Code § 835a........ 29

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

# INDEX OF EXHIBITS

| Exh. | Description |
|---|---|
| A | 911 Call # 1, PPD 180 |
| B | 911 Call # 2, PPD 181 |
| C | Main Dispatch Audio, PPD 178 |
| D | Dispatch CAD Logs, PPD 498-507 |
| E-1 to E-32 | E-1 – Declaration of McFarlane with Rule 26 Report<br>E-2 – Supplemental Report of McFarlane<br>E-3 - Video Timeline 12:33 pm to 5:33 pm.MOV<br>E-4 – Video Timeline 17:56 pm to 03:18 am.MOV<br>E-5 – Video Timeline 05:52 am to 08:13 am.MOV<br>E-6 – 001_INITIAL RESPONSE OUTSIDE_1233 to 1309 hrs.MOV<br>E-7 – 002_INITIAL RESPONSE HALLWAY_1234 to 1305 hrs.MOV<br>E-8 – 003_HALLWAY_1304 to 1334 hrs.MOV<br>E-9 – 004_HALLWAY_1335 to 1405 hrs.MOV<br>E-10 – 005_HALLWAY_1402 to 1546 hrs.MOV<br>E-11 – 006_HALLWAY_1405 to 1435 hrs.MOV<br>E-12 – 007_HALLWAY_1435 to 1505 hrs THIS ONE.MOV<br>E-13 – 008_HALLWAY_1505 to 1528 hrs.MOV<br>E-14 – 009_HALLWAY_1601 to 1708 hrs.MOV<br>E-15 – 010_HALLWAY_1708 to 1824 hrs.MOV<br>E-16 – 011_HALLWAY_1838 to 1849 hrs.MOV<br>E-17 – 012_HALLWAY_1959 to 2023 hrs.MOV<br>E-18 – 013_HALLWAY_2108 to 0046 hrs.MOV<br>E-19 – 014_HALLWAY_2116 to 2124 hrs.MOV<br>E-20 – 015_HALLWAY_2124 to 2131 hrs.MOV<br>E-21 – 016_HALLWAY_2243 to 2253 hrs.MOV<br>E-22 – 017_HALLWAY_2310 to 2321 hrs.MOV<br>E-23 – 018_HALLWAY_2329 to 2336 hrs.MOV<br>E-24 – 019_HALLWAY_0013 to 0056 hrs.MOV<br>E-25 – 020_HALLWAY_0122 to 0147 hrs.MOV<br>E-26 – 021_HALLWAY_0204 to 0216 hrs.MOV<br>E-27 – 022_HALLWAY_0250 to 0340 hrs.MOV<br>E-28 – 023_HALLWAY_0551 to 0642 hrs.MOV<br>E-29 – 024_HALLWAY_0508 to 0828 hrs.MOV<br>E-30 – 025_HALLWAY OIS_0811 to 0812 hrs.MOV<br>E-31 – 026_HALLWAY OIS ANNOTATED TRIMMED 583 IMAGES.MOV<br>E-32 - 027_PORTER CRITICAL IMAGES.pdf |
| F-1 to F-3 | F-1 – Declaration of Det. Elmore<br>F-2 – Report of Det. Elmore<br>F-3 – ***TIMELINE OF KEY INCIDENT EVENTS*** |
| G | Deposition of Lt. Hatcher |
| H | Deposition of Cpt. Wentz |
| I | Det. Nash Report and Arrest/Search Warrant |
| J | Deposition of Ofc. Mejia |
| K | Operations Plan and Related Documents |
| L | Deposition of Sgt. Smith |
| M | Relevant PPD Policies |
| N-1 to N-2 | N-1 – Video of Gianna Porter in Hallway 1, PPD 386<br>N-2 – Video of Gianna Porter in Hallway 2, PPD 387 |
| O | Ofc. Mejia's BWC Video, PPD 170 |
| P | Lt. Hatcher's Notes of Incident |
| Q -1 to Q-4 | Q-1 – Barreiro Rule 26 Report<br>Q-2 – Barreiro Video Timeline of Shooting |

| | |
|---|---|
| | Q-3 – Barreiro Video Timeline of Shooting, Detail<br>Q-4 – Barreiro Frames (PDF) |
| R-1 to R-12 | Relevant Photographs of Incident |
| S-1 to S-2 | S-1 - Porter Video Interview at Hospital<br>S-2 – Transcript of Porter's Video Interview at Hospital |
| T | Deposition of Mr. Porter |
| U | Declaration of Mr. Fonzi with Rule 26 Report |
| V | Deposition of Det. Greely |
| W | Declaration of Dr. Weiss with Rule 26 Report |
| X | Deposition of Dr. Weiss |
| Y | Deposition of Dr. Mohandie |


McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

## I. INTRODUCTION

Over an almost twenty hour period from February 23rd into 24th of 2022, Plaintiff Ashton Porter ("Porter") illegally barricaded himself in a fourth floor hotel room, vandalized / destroyed the room, threw items out a window he broke out and refused to leave the room despite hours and hours of peaceful communications and negotiations with mental health professionals, trained crisis negotiators as well as after negotiations from police personnel from the Pittsburg Police Department ("PPD"). More than twelve hours after police obtained an arrest warrant for Porter's arrest due to his illegal actions, including Porter swinging and brandishing a large kitchen knife at several police personnel near the hotel door several times, after hours and hours of further negotiations and several escalating force options (chemical irritants like pepper spray (OC), other CS Ferret gas and then "hot gas"), Porter finally came out of the room, empty handed. Instead of getting down on his knees as commanded numerous times, it is undisputed that Porter reached in his sweatshirt and pulled out a large kitchen knife, and after two pain compliance sponge rounds did not gain compliance, Porter, with the knife now raised over his head in an attack position, then started to make a move down the hall towards Ofc. Mejia and other officers, leading to the lawful use of deadly force (two rapid gunshots) by Ofc. Mejia to protect himself and nearby officers. **Porter's time in the hallway up to the shooting was only a matter of about 7 seconds, leaving only fleeting seconds for Ofc. Mejia's force decision**. Body Worn Camera ("BWC") videos captured these harrowing and rapid moments, as well as the split second decision to use defensive deadly force by Ofc. Mejia when Porter made his move with the large knife in the attack position.

After negotiations broke down and while escalating chemical irritants were used to flush out Porter from the room, and two less lethal 40 mm sponge rounds were fired at Porter in the hallway once the knife was presented, **this case centers around the deadly force (two gunshots) by Ofc. Mejia to stop Porter's deadly armed approach in the narrow hallway** (no other officers who used force are named herein). There is no dispute here that Porter was armed with the large knife in his raised right hand in the hallway at the time of gunfire, as confirmed by video evidence. Despite the many hours and negotiation efforts to get Porter safely into custody, this case centers on those threatening armed actions and movements by Porter in the hallway over those 7 seconds.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

Porter survived his two gunshot injuries and filed suit. The First Amended Complaint ("FAC") is the operative one. *See* ECF 67. Porter asserts the following Causes of Action ("COA"):

| **COA** | **ALLEGATIONS** | **PARTIES INVOLVED** |
|---|---|---|
| 1 | Excessive Force per Fourth Amendment | Mejia |
| 2 | Title II of ADA | City |
| 3 | *Monell* – Failure to Supervise | City, Chief Addington |
| 4 | Supervisor Liability | Wentz, Hatcher, Smith |
| 5 | Ca. Civil Code § 52.1 – Bane Act | Mejia, City |
| 6 | Negligence | All Defendants (not Addington) |
| 7 | Battery | Mejia, City |

In general, in addition to the claimed unlawful deadly force by Ofc. Mejia, Plaintiff also attempts to hold the City and scene supervisors responsible for the shooting, includes a hollow *Monell* claim and meritless ADA claim as well, plus related state claims. As the Court can see on this extensive motion, jointly filed by all Defendants, Defendants are entitled to judgment as a matter of law and/or qualified/state immunity applies here, leading to summary judgment by Defendants. All exhibits referenced herein are attached to the Declaration of Blechman.

## II. RELEVANT FACTS

### A. Initial Calls for Police to the Hotel

On February 23, 2022, around 12:28 p.m., police dispatch received several calls about a guest (Porter) at the Hampton Inn & Suites ("hotel") in Pittsburg, California, who was refusing to open the door to his room, was barricading his door, broke his fourth floor window and threw items down into the parking lot below and was yelling help. **Ex. A**, 911 Call #1; **Ex. B**, 911 Call #2 (starts at 2:12 RT (audio Running Time); **Ex. C**, Main Audio Dispatch (starts at 10:12 RT); **Ex. D**, Dispatch Report. Porter was identified as the person associated with the room and officers were then dispatched to the hotel, and medical personnel were also staged in the area. Ex. C-D.

As this call for service led to a prolonged encounter with Porter involving numerous PPD officers, along with their abundant BWC videos (over 150 videos pertaining to this incident were produced in this case), defense video expert Mr. McFarlane has created synchronized video timeline files of the key moments of the twenty hours of the encounter, along with other critical synced and related demonstratives, to assist the Court's evaluation of this motion, the foundation of which is laid by Mr. McFarlane. **Ex. E-1**, Declaration and Rule 26 Report of McFarlane; **E-2**,

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

Supplemental Report; **E-3**, Video Timeline 12:33 p.m. to 5:33 p.m.; **E-4**, Video Timeline, 5:56 p.m. to 3:18 a.m.; **E-5**, Video Timeline 5:52 a.m. to 8:13 a.m. Other demonstratives are included as well, including synced videos of the initial response to the hotel, outside and in the hallway by officers, then various videos of hallway interactions over the next 19 hours. *See* **Ex. E-6** to **E-29**. Mr. McFarlane has also synced up and annotated the key videos and still images for the critical seconds when Porter comes into the hallway, presents a knife and then was shot. See **Ex. E-30**, Hallway Shooting; **E-31**, Hallway Shooting, Annotated and Trimmed; **E-32**, PDF of 582 Critical Images from E-31. To further assist the Court, lead PPD Det. Elmore has reviewed all the key evidence as to this shooting incident and investigation and has provided an overview and timeline of this incident per his declaration, report and attached timeline of events. **Ex. F-1**, Declaration of Det. Elmore; **Ex. F-2**, Report of Det. Elmore; **Ex. F-3**, **TIMELINE** (NOTE: *See* TIMELINE for cites to key BWC/video moments referenced below for ease of the Court's understanding/review).

After being dispatched, officers arrived on scene around 12:33 p.m. Ex. F-2, F-3. Porter had thrown a lamp(s) from a shattered fourth floor window and yelled that somebody was trying to get him. Family member Devel Foster explained to Ofc. Lombardi that Porter was having a psychotic break. Officers attempted communication and explained they were there to help. Porter told officers, "You're gonna kill me," and requested to talk to his wife (who resided in Georgia), claiming someone took her. Officers noted apparent blood on Porter's hand, but Porter denied it was blood and stopped communicating. Porter's uncle Dennis Foster arrived on scene to assist. Ex. F-2, p.2-3; Ex. F-3. The Mobile Mental Health Evaluation Team ("MHET"), a team made up of PPD officers who have specialized crisis negotiation training, were summoned to the scene. *Id*; **Ex. G**, Hatcher Depo., 73:4-11. Porter was offered medical assistance, but advised he was not hurt (despite the blood seen). *Id*. Ofc. Fernandez, a trained negotiator, tried to communicate with Porter through the hotel room door, but Porter said he needed some time and would not come out of the room. Ofc. McGuire (MHET team) took over negotiations around 1:23 p.m. *Id*. Due to the damage to the window, barricaded nature inside the room and broken items Porter threw out of the window, hotel staff had already ordered Porter to leave and also wanted him arrested for trespassing per Penal Code ("PC") § 602(o) and vandalism per PC § 594(b)(1). Ex. F-2, p. 3.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

**B. Prolonged Additional Negotiations Failed to Get Porter to Come Out**

Over the next several hours, mental health staff and crisis negotiators tried de-escalate Porter and convince him to come out of the room, but he refused. Ex. F-2, p.3; F-3. Via scene interviews with family members, it was learned that Porter recently left his home in Georgia, had been extremely stressed about a property, had not slept in days, was acting strange and paranoid, family members tried to get him mental health treatment at Kaiser hospital in Oakland, but Porter fled. *Id.* Due to the broken out window and fear of Porter jumping out due to his prior statements, that afternoon, the PPD secured the window using a City vehicle to secure a large piece of plywood to the window. Ex. F-2, p.4; Ex. G, 53:1-22; **Ex. H**, Wentz Depo., 40:25-41:16; 99:4-13.

Officers and mental health staff tried to communicate with Porter for the next four hours, but around 5:00 p.m., Porter was no longer communicating. *Id.*; Ex. F-3. The hotel gave PPD Ofc. Maguire a key card to open the door to re-establish communication and also check on Porter's welfare as he had been seen bleeding from his arm earlier. *Id*. The door was opened by the officers, but could only open a few inches as it was barricaded, so a baton was used to try to keep the door open. Ex. F-2, p.3; F-3. **At 5:02 p.m., Porter then became agitated and came towards the door and used his knife to slash at nearby officers**, as Porter yelled "come on, come on!" in a challenging fashion. *Id*. Officers then reported via radio that Porter had a knife, the first time they confirmed he had a weapon. *Id*. After a period of time, the officer was able to pull his baton out of the door, then Porter forced the door closed and ceased contact for an extended period of time. Ex. F-2, p.4; F-3. Negotiations then continued with the MHET team, including Ofc. Maguire, as well as members of the County's Mobile Crisis Response Team, but did not gain Porter's compliance to exit the room or peacefully surrender. Ex. G, 72:21-73:3; Ex. H, 65:6-68:15.

**C. SWAT Team Activated for Assistance**

After further and extended negotiations did not garner compliance of Porter for his peaceful surrender, including with mental health professionals, the PPD SWAT team and Crisis Negotiation Team (CNT) were activated (meaning called to and assembled at the PPD for an operation) to assist, at around 5:45 p.m. on February 23rd. Ex. F-2, p.4; Ex. H, 44:15-45:25. Det. Nash authored a search and arrest warrant for Porter and his room. Ex. F-2, p.4; **Ex. I**, Det. Nash Report and


6657729

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

Arrest/Search Warrant. At approximately 7:33 p.m., the felony *Ramey* arrest and related search warrant was signed by Judge Burch, commanding officers to take Porter into custody. *Id*.

Lt. Hatcher was notified this call for service was going to be transitioning to a SWAT response and was provided with a felony arrest warrant commanding officers to take Porter into custody for felony vandalism, trespassing and brandishing a large butcher knife, so then officers started operational planning. Ex. G, 47:7-51:21; **Ex. J,** Mejia Depo., 95:21-96:25. An **Operations Plan** ("Op. Plan"), a plan to outline the goals of an operation, the tactics and other key information, was prepared for this operation and then the SWAT officers held a **briefing** at the PPD to discuss the Op. Plan, this escalating incident, the contingencies and plans to try to obtain Porter's peaceful surrender and go over all details of this operation. **Ex. K**, Operations Plan; Ex. G, 49:1-51:21; 52:23-55:18; Ex. J, 40:10-41:12; 65:12-69:5; 76:2-78:20; 93:17-20; 100:4-13; Ex. H, 42:25-44:7.

The Op. Plan included information about barricaded subject Porter, armed with a knife, the fourth floor layout and Room 421 layout, descriptions of assignments of the various SWAT and other personnel, equipment, contingency plans, team positioning issues and additional information for this operation. *Id*. This also included information about Porter's prior criminal history, including violence, he may be armed with a weapon and there was clearly mental health issues involved. *Id*. The Op. Plan was signed off by a supervisor. Ex. J, 42:14-43:10; 95:8-14. The mission was Porter's peaceful surrender. *Id*., 81:19-82:5; 100:15-19. The Op. Plan also included numerous plans and options depending on how the situation progressed, including (A) establish contact to de-escalate the situation to attempt to have Porter surrender, (B) create a ruse by SWAT pretending to leave and see if Porter wants to continue communications, (C) if Porter fails to surrender after ample time, then SWAT will deploy gas in attempt elicit Porter to exit and safely surrender, and (D) if communication and gas did not work, SWAT would breach, hold and enter with a drone or robot to order Porter out of the room and/or get a visual of Porter and the room. Ex. K; Ex. J, 82:6-85:24; 88:6-93:16. The Op. Plan also included numerous contingencies and/or force options based on different scenarios depending on Porter's behavior. *Id.*

At approximately 9:00 p.m. on February 23rd, SWAT and CNT arrived at the hotel. Ex. F-2, p.4; F-3. The SWAT team was led by SWAT commander Lt. Hatcher, a 17 year veteran of the

PPD and SWAT team at that point in time. Ex. G, 7:16-23; 19:25-20:8; 22:11-13. On this operation, in addition to Lt. Hatcher as the SWAT commander, Cpt. Wentz was the incident commander, Sgt. Smith was the tactical commander and Ofc. Mejia was the assistant team leader. Ex. G, 27:9-10; 28:4-29:8; 39:8-40:13; 41:1-15; Ex. H, 81:17-84:1. Cpt. Wentz, the on-scene incident commander, knew about the tools available to SWAT and gave Lt. Hatcher the operational authority for this SWAT operation and approved the use of escalating force options. *Id.*

Cpt. Wentz, an officer with PPD since 1997 and a former SWAT team leader himself, was the incident commander for this operation. Ex. H, 13:18-17:18; 20:2-21:24; 22:9-17; 34:9-35:12. Typically, like here, the tactical commander (Lt. Hatcher) would be in charge of tactics for an incident, while Cpt. Wentz had overall command of the situation and was keeping Chief Addington advised of what was occurring and as to developments. Ex. H, 36:11-40:11. Chief Addington did not consult at all on tactics or strategies at the hotel. Ex. H, 42:6-24. While Cpt. Wentz had authority to overrule Lt. Hatcher's tactical decisions, he did not believe he did in this incident. *Id.*, 64:15-65:5. Cpt. Wentz was on the scene from the afternoon, around the time wood was put up over the broken out window, off and on, up until the shooting. *Id.*, 99:4-101:10.

Sgt. Smith had been with the PPD since 2006 and joined the SWAT team in 2014, first as a tactical medic and worked his way to SWAT team leader in 2022. **Ex. L**, Smith Depo., 15:17-16:14; 20:9-22:19. As the team leader for this operation, Sgt. Smith's duties included supervision of personnel and execution of tactics for the operation. *Id.*, 24:7-23.

Ofc. Mejia started with the PPD in 2014 where he worked until June of 2022. Ex. J, 17:14-21; 23:1-3. Ofc. Mejia was trained on the various levels of force and that deadly force is the most serious type of force and that force is measured in relation to the threat or resistance an officer is facing. *Id.*, 26:7-31:23. Ofc. Mejia joined the SWAT team in 2016, a specialized and extra trained group of officers who handle more significant operations and situations than can be handled by patrol officers. *Id.*, 34:19-36:14. Ofc. Mejia assisted in the preparation of the Op. Plan after SWAT was summoned to assist and was the assistant team leader for this call. *Id.*, 62:8-65:4; 95:15-20. In addition to a general Use of Force Policy, the PPD also had a barricaded subject policy that provided direction to officers. Ex. H, 57:1-61:17; **Ex. M**, Relevant Policies.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

**D. <u>Continued Negotiations With SWAT Team Providing Support</u>**

At some point, the entire fourth floor was evacuated of all guests for safety purposes. <u>Ex. G</u>, 56:20-57:4; Wentz, 54:5-55:13. The SWAT team divided into two teams so both end of the hallway staircase exits were blocked (south and a north team) in case Porter tried to escape, to keep him on the fourth floor. <u>Ex. F-2</u>, p.4; <u>Ex. G</u>, 55:12-18. The SWAT team provided cover for safety of continued negotiations by several crisis negotiators, including Sgt. Thompson, Ofc. Fernandez, Cpl. Davis and Cpl. Riddick, among others. <u>Ex. F-2</u>, p.4; <u>F-3</u>. Further negotiations for a prolonged period of time did not get Porter to drop his knife out of the room, nor come out and surrender. Personnel from the MHET team also attempted negotiations with Porter, but that was not effective. County Behavioral Health and the County Mobile Crisis Response Team personnel attempted as well, without success. *Id.*; <u>Ex. G</u>, 74:4-75:19. Negotiators also allowed family members up to the area of the hotel room to attempt communications, but Porter claimed he did not recognize family members and would not comply to come out of the hotel room. *Id.*; <u>Ex. G</u>, 84:19-85:1.

When Porter requested water / food, he was brought water and food, but he did not retrieve it as he believed it had been poisoned or tainted. *Id*.; <u>Ex. G</u>, 75:20-24. Continued negotiations with Porter did not get him to peacefully come out of the room and then Porter was not fully communicating. At that point, mental health teams relayed that they could go no further left the floor, but stayed in the hotel. <u>Ex. F-2</u>, p.4. <u>Ex. G</u>, 91:8-92:3; 95:1-96:25; <u>Ex. H</u>, 67:21-68:15.

At some point, Lt. Hatcher, the SWAT commander, then tried to continue negotiations with Porter, including trying to convince Porter to remove barricaded items from the door, which seemed to almost work, but then Porter would continue to barricade. <u>Ex. F-2</u>, p.4; <u>F-3</u>; <u>Ex. H</u>, 69:4-72:9. Around 4:30 am, Porter's wife Gianna arrived at the hotel and Lt. Hatcher allowed Ms. Porter up to the hallway by the room to try to use her to convince Porter to surrender and come out of the room, but even after about twenty-five minutes, Porter still refused to come out and did not believe that Ms. Porter was even his wife so she was removed for her safety. <u>Ex. F-2</u>, p.4-5; <u>F-3</u>; <u>Ex. G</u>, 81:9-83:1; 87:14-19; **<u>Ex. N-1</u>** to **<u>N-2</u>**, Videos 1 and 2 of Gianna Porter in Hallway. Officers were there for crisis negotiations initially, but then this operation moved towards executing the court order arrest warrant for Porter's arrest when Porter did not come out of the room. <u>Ex. G</u>, 85:9-25.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

After more than five hours of continued negotiations by Lt. Hatcher and others failed to secure Porter's exit, then officers introduced the first stimulus by hitting the door with the ram (at 2:59 am). Ex. F-3. This failed to get the door open or cause a hole, then additional negotiations occurred. *Id*. Around 3:21 am, the door was rammed again which made a small hole (port) in the door so officers could see in the room to gather more information and/or see if Porter was trying to self-harm. Ex. F-2, p.5; F-3; Ex. G, 76:21-77:6; 77:22-78:19; 81:2-8; 86:5-16. SWAT personnel could see Porter in the room and saw that he was still armed with the knife. Ex. F-2, p.5; F-3.

After additional negotiations failed, at 5:53 am, an officer deployed pepper spray into the hotel room through the port to try to get Porter to exit (the first force that affected Porter), but Porter did not exit. Ex. F-2, p.5; F-3. Lt. Hatcher continued to try to coax Porter out of the room and while Porter at some points appeared that he was moving the barricade away, Porter then regressed and put barricades back in place. *Id*. At 6:02 am, while Lt. Hatcher was near the hole in the door, **suddenly and aggressively, Porter swung the knife several times at Lt. Hatcher's hand and also towards Ofc. Salamanca**, causing the officers to jump away to avoid being cut. Ex. F-2, p.5; F-3; Ex. G, 87:20-88:7; 88:23-90:23. Porter then used a pillow to try to cover the port hole. When officers approached to try to remove the pillow, Porter again lunged at officers with the knife. *Id*.

Despite Porter's violence, negotiations continued as well as pepper spray into the room additional times to try get Porter out of the room (at 6:10 am and 6:22 am), but to no avail. Ex. F-2, p.5; F-3. Lt. Hatcher then authorized CS Ferret gas rounds, another chemical irritant, which were fired into the room at 6:43 am and, despite coughing and discomfort, Porter still refused to exit. *Id*. At one point Porter indicated that he did not have the knife, but then SWAT personnel could see it was hidden in his waistband and then he accessed it as well, attempting to deceive nearby officers (around 6:54-7:02 am). *Id*. Officers tried to get him to put the knife down at the back of the hotel room and come out or toss the knife out of the hole, but Porter did not comply. *Id*. Around 7:22 am, officers also used the ram and were able to break the door in two, allowing space for Porter to exit, but he did not. *Id*. Additional CS Ferret gas rounds were deployed in the room at 7:13 am and 7:49 am, but Porter did not come out, nor relinquish the knife, even after additional negotiations between these rounds by Lt. Hatcher. *Id*. A total of six to seven CS Ferret rounds were used until officers

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

ran out of them. *Id*. It was Lt. Hatcher's decision to use gas or not and the timing of these events. Ex. J, 125:1-6. Importantly, during these additional negotiations that morning, Porter was told repeatedly by Lt. Hatcher that he if came out of the room into the hallway, he should lay on his stomach or get on his knees, and with nothing in his hands. Ex. F-3 (6:20-8:12 am (shooting)).

Eventually, Lt. Hatcher authorized team leader Sgt. Smith the use of a pike ram equipped with CS hot gas ("hot gas"), a tool capable of penetrating sheet rock so the hot gas could be deployed directly into Porter's room, to try to flush Porter out of the room, as this was the most effective chemical irritant available to SWAT. Ex. F-2, p.5-6; F-3; Ex. G, 57:19-61:21; 64:16-21; 78:21-80:19; 92:5-93:12; Ex. L, 25:25-34:3; Ex. H, 50:6-52:23. SWAT teams were stationed south (contact team) and north (react team) of Porter's room to contain Porter to the fourth floor for safety of officers and other hotel members and there were lethal and less lethal options available at either end, with the less lethal including the taser and 40 mm sponge baton rounds. *Id*.

Sgt. Smith was on the south hallway side (contact team) with his firearm out, with several other officers with their assigned option, with a ballistic shield nearby, including Ofc. Haller and Ofc. Harvey with the 40 mm less lethal sponge rifle and an officer prepared with a taser. Ex. L, 25:25-34:3; 38:25-39:22; F-3. The 40 mm less lethal sponge rifle is a pain compliance tool which should be shot at least from five feet or more away. The taser has an effective range of about 21 feet. Smith's south side position was about 60 feet from Porter's Room 421. Ex. L, 40:3-43:8; 51:18-52:12; 53:14-24; Ex. J, 44:11-45:12; F-3. If Porter came out and was not dropping the knife, then officers could deploy the 40 mm less lethal munitions, to cause him pain to drop the knife or gain compliance, and the taser option was available if he charged at the south officers. *Id*.

There was also the react team on the north side of the hallway, the other side of Porter's room from the south team, which included Ofc. Mejia, with force options at the ready (pepper spray, taser and firearm (lethal cover), but no 40 mm rounds) if Porter came towards them. The north team was also partially inside a room for cover, but not so close to Porter due to fact Porter was armed with a knife. Ex. L, 36:7-37:3; 43:21-44:7; 53:14-24; 56:9-60:25; Ex. J, 51:1-53:17; 102:7-22; F-3. Lethal cover officers are necessary in case less lethal options fail to stop a threat. Ex. J, 57:25-58:22. Mejia was lethal cover, with two other officers in the room, one of which, Ofc.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

Barbanica, had the taser and who was straddling above Mejia so he could have a potential view and aim if necessary, while Mejia kneeled with his gun. Ex L, 106:3-107:1; 133:22-135:7; F-3.

The officers (all team members) had all been briefed about cross-fire issues if deadly force was needed, which was another reason the north side team was partially inside a room. Ex. L, 44:14-46:20. Officers on the north side would not be directly in the hallway as that was a cross-fire danger and danger if Porter fled towards them with the knife. Ex. L, 72:7-73:11. Sgt. Smith had notified Mejia (north side), the assistant team leader, that hot gas was going to be deployed. Ex. L, 68:6-70:5; Ex. J, 103:1-21. SWAT officers knew that the hot gas, the last chemical option and resource available to officers, was likely to flush Porter out of the room due to its effectiveness and for officers to have enough time and distance for Porter to comply with commands when he came out and as they knew he had access to a knife. Ex. F-2, p.5-6; Ex. G, 67:2-69:14. The crisis negotiators, still in the hotel at that point, were then moved to the lobby for their safety when the hot gas started, but could be summoned for additional negotiations if that occurred. Ex. G, 91:8-92:3; 95:1-96:25. Only negotiator Ofc. Maguire was relieved from the scene by that time because she had been on this call for an extended time period. *Id*.

Cpt. Wentz had been at the hotel, mostly on the fourth floor, during this incident. Ex. G, 94:7-25. When he was presented with differing routes when negotiations broke down, one of which was the immediate use of hot gas, **Cpt. Wentz had instead authorized a slow escalation of stimulus, to try to elicit a physical response from Porter**, namely to come out of the room, starting with breaching the door, pepper spray, then some Ferret gas and this progressed to eventual hot gas when the prior options did not work. Ex. G, 69:8-70:13; 77:9-21; 95:1-96:25; Ex. H, 72:10-74:14; 75:18-79:4; 79:25-81:16. The use of hot gas was the last chemical irritant they could use and Cpt. Wentz believed that Lt. Hatcher had exhausted all other options at that point so approved the use of hot gas. Ex. H, 97:5-98:18. When the hot gas started, Porter came towards the front of the hotel door, but still refused to come out so additional hot gas was introduced into the room. Ex. F-2, p.5-6; F-3. Eventually, due to the use of hot gas, at 8:12 am, Porter came out of the room, into the hall, where seconds later, he presented a deadly, armed threat. Ex. F-2, p.5-6; F-3.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

**E. Porter Flushed Out of Room and Presents Deadly Threat**

When the hot gas appeared to be working to flush Porter out of the room, as Porter was about to go out of the room and into the hallway, he was given numerous commands to exit into the hallway and to drop down onto his knees. Ex. F-3. Porter eventually started to step over the damaged door and into the hallway at about 8:12 a.m. As he was stepping over, Ofc. Mejia commanded him "When you come over, put your hands in the air and get down on the ground!" Ex. F-3; Ex. J, 99:8-11. Another officer commanded him to "get on the ground," then Porter is commanded numerous times to get "On your knees! Get on your knees now! Get on your knees now!" by an officer who is even gesturing downward to Porter. Ex. F-3, p. 8 (8:12:12 to 8:12:20).

**Porter did not get down on his knees and did not obey the commands**. Ex. L, 78:14-79:10. **Instead, Porter reached in his sweatshirt and eventually pulled out a large knife**. With the knife in Porter's right hand, edge side out of the pinky side of his right hand, in an attack position, then two 40 mm less lethal sponge rounds were shot at Porter, one by Ofc. Haller and one by Ofc. Harvey, to gain compliance. Ex. L, 78:14-79:10; Ex. J, 50:4-6; Ex. F-3, p. 8 (8:12:16 to 8:12:23). Porter did not comply, instead he turned towards Ofc. Mejia, dropped his bodyweight, and started to move quickly towards Ofc. Mejia's (and other officers) position down the hall with the large knife raised. Ex. L, 80:4-81:10; 97:25-98:12; Mejia, 126:23-128:15; Ex. F-3, p. 8 (8:12:16 to 8:12:23). Due to the imminent threat of serious bodily injury or death that Porter demonstrated to Ofc. Mejia and nearby officers, from the perspective of a reasonable officer in Ofc. Mejia's position, Ofc. Mejia fired two controlled handgun shots at Porter, in rapid succession, causing Porter to fall to the ground towards Ofc. Mejia and drop the knife, which then slid away from Porter and closer to Ofc. Mejia. Ex. L, 78:14-79:10; 86:21-87:12; 89:5-90:13; Ex. J, 38:13-39:20; 126:23-128:15; Ex. F-3, p. 8 (8:12:12 to 8:12:20); **Ex. O**, Ofc. Mejia's BWC (PPD 170). Cross-fire is always a concern, but it was not an issue in this shooting. Ex. L, 92:2-7; Ex. J, 108:18-109:18; 111:24-112:6; 114:7-12.

**From the time Porter entered the hallway to the time of the final gunshot was only about 7 seconds**. Ex. F-3, p.8 (8:12:16 to 8:12:23). **The 40 mm shots plus the two gunshots occurred in only 1.5 seconds, and the two gunshots only occurred in less than 0.5 of a second**.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

Ex. E-2; Ex. F-3, p.8 (8:12:21 to 8:12:23. Ofc. Mejia was about ten feet away from Porter at the time he fired at Porter. Ex. J, 114:24-115:8; 127:8-128:5. Prior to firing, Ofc. Mejia did not have any awareness of any 40 mm sponge rounds being fired. Ex. J, 121:21-24; 124:14-21. Mejia did not fire at Porter until Porter advanced at him with the knife raised. *Id*., 129:23-132:2; 133:7-9. This incident is the only time Ofc. Mejia ever discharged his weapon at a person. *Id*., 142:7-10.

Afte the shooting, officers then slowly and tactically approached Porter, used the shield to hold him down temporarily while the knife was moved away from him, Porter was then handcuffed and then immediate medical treatment was provided. Ex. F-3. Porter was taken downstairs for further treatment until other medical personnel arrived, then Porter was taken to the hospital. *Id*.

Overall, on this call for service, the Mobile Crisis Response Team was on scene for about ten hours of active negotiations with Porter, three of which while SWAT was present. Ex. G, 45:2-47:6; 71:10-14; **Ex. P**, Lt. Hatcher's Notes. The Mental Health Evaluation Team/Crisis Negotiation Team were on scene for about fourteen hours total, twelve of which included active negotiations, three and half of which was while the SWAT team present. *Id*. SWAT was on scene for about eleven hours up to time of the shooting, five and a half of which for negotiations prior to the use of escalating force options up to the shooting. *Id*. The shooting occurred (8:12 am) over twelve hours after officers obtained the warrant for Porter's arrest (at 7:33 am). Ex. F-3; Ex. I.

Plaintiff's video expert, Mr. Barreiro, confirms the rapidity of the shooting in the hallway, as well as the fact that the two 40 mm sponge rounds were fired prior to the two gunshots. **Ex. Q-1**, Barreiro Rule 26 Report, **Q-2 to Q-3**, Video Timeline of Shooting; **Q-4**, Barreiro Frames (PDF).

### F. Post-Shooting Investigation

Photographs taken following the incident captured the large size of Porter's kitchen knife that was in his possession, as well as photographs of the broken hotel window, debris in parking lot, as well as the damaged and bloodied room of Porter. **Ex. R-1 to R-12**, Relevant Photographs.

Porter was interviewed in the hospital and also made several admissions in his deposition as well. **Ex. S-1**, Video Interview; **Ex. S-2**, Transcript of Interview; **Ex. T**, Depo. of Porter. Porter admitted he bought the knife to protect himself, told officers throughout the night that he was armed, and kept it concealed in his sweatshirt pouch until he entered the hallway. Ex. T, 107:6-17;

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

154:12-14; 179:6-13. In the hallway, at some point, he raised both hands with the knife in his right hand, turned toward the officers down the hall and took at least one step before falling down. He did not have a thought of surrendering, never got on the ground until he was shot, and did not drop the knife despite being hit with the less-lethal deployments. *Id*., 191:18-192:3; 189:11-19; 193:9-12; 187:7-18; 220:12-22. He conceded he was within range to throw the knife at Ofc. Mejia and <u>the knife was in his hand when Ofc. Mejia fired</u>. *Id*., 260:7-14; 257:13-16. In his *Mirandized* statement Porter admitted he knew moving towards an officer with a knife meant that some force was going to be used against him. *Id*., 200:14-19.

### G. <u>Opinions by Relevant Experts</u>

Mr. Fonzi, Defendants' police expert, has opined that the involved officers utilized proper de-escalation tactics with Porter for hours and hours, even negotiating for 12 plus hours after obtaining the arrest warrant. **<u>Ex. U</u>**, Fonzi Decl. and Rule 26 Report, pp. 5-18. Mr. Fonzi also opines that from the perspective of a reasonable officer in Ofc. Mejia's position, Porter, armed with a knife in an overhead position and moving towards Ofc. Mejia's position at the north end of the hallway demonstrated Porter was an imminent threat of death or serious bodily injury, leading to objectively reasonable deadly force by Ofc. Mejia, along with other relevant opinions. *Id*.

Plaintiff's police expert, Det. Greely, made numerous critical concessions and admissions at his recent deposition. He did not criticize Chief Addington, Cpt. Wentz or Sgt. Smith in his report, nor discusses any other PPD incidents, nor provides criticisms of the training or experience of any Defendants or PPD officer. **<u>Ex. V</u>**, Greely Depo., 55:21-56:21; 57:16-58:11; 204:9-16. He does not have any criticisms of any PPD policies. *Id*., 58:12-60:25. He understands the outside administrative investigation of the incident found no policy violations. *Id*., 61:5-62:7. He is not critical of PPD officers obtaining arrest warrant for Porter, nor the Op. Plan or briefing in this incident, nor containing Porter to the fourth floor, having teams both north and south of Porter's room and having lethal cover of Porter. *Id*., 91:18-93:11; 154:3-155:15; 239:12-17. Det. Greely admits that officers had the legal right arrest Porter right away when the SWAT team arrived per the arrest warrant. *Id*., 159:10-21; 162:24-164:1. He agrees officers went heavy on negotiations and this incident went down the path of a slow escalation of stimulus. *Id*., 164:2-165:7; 168:24-169:7.


6657729

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

Agrees that Porter pushing knife out of door several times could indicate an intent to hurt them and a knife can cause death or serious bodily injury and could have been thrown. *Id*., 214:2-10; 215:25-216:25. Det. Greely's criticisms in this incident start around 12:45 am on February 24th, when Lt. Hatcher starts doing the majority of communications with Porter and is not critical of prior negotiations or tactics. *Id*., 93:12-97:6. He is not critical of the prior uses of force (pepper spray and Ferret gas), nor the 40 mm rounds in the hallway, but is critical of the use of the "hot gas" and deadly force. *Id*., 107:17-109:21. Agrees first force implement that impacted person of Porter was pepper spray into the room at 5:53 am. *Id*., 36:3-37:15; 166:4-8. Det. Greely does not dispute that Porter came into the hallway empty handed, looked around, reached in his sweatshirt, an officer safety concern, and then armed himself with the knife. He also agrees that events in the hallway happened very quickly and he does not dispute that Porter was armed with the knife, was a potential threat and was about ten feet away from Ofc. Mejia at the time of the gunshots. *Id*., 114:4-117:9; 124:12-127:9; 181:7-9; 191:12-192:14; 256:2-16. Porter did not comply with commands to get on knees in the hallway. *Id*., 177:13-179:21. The closer an officer is to someone with a knife increases officer safety risks. *Id*., 186:16-187:3. He is not rendering any opinion about whether the shooting violated the law and <u>even concedes that per Ofc. Mejia's version of events, deadly force was appropriate</u>. *Id*., 118:19-119:4; 136:3-137:15; 181:16-182:12; 231:5-23. Det. Greely agrees that the video evidence shows Porter turning and start to move in Ofc. Mejia's direction just prior to the gunshots and Porter admits he took at least a step, then Porter fell forward after he was shot. *Id*., 137:16-139:20; 181:10-15; 197:18-198:13; 225:15-23. He is not critical of the number of shots by Ofc. Mejia, both of which hit Porter and not any officers. *Id*., 142:2-7; 249:1-8.

Dr. Weiss, Defendants' psychiatry expert, the only expert to examine Porter, opined that throughout the incident Porter was in the midst of a psychotic episode that conferred an appearance of dangerousness to both lay observers and officers and he was out of touch with reality. **<u>Ex. W</u>**, Dr. Weiss Decl. and Rule 26 Report, pg. 10; **<u>Ex. X</u>**, Dr. Weiss Depo, p. 83:6-11. The knife-wielding Porter was not under good behavioral control, was agitated despite hours of negotiations, was unreasonable and therefore was dangerous. *Id*. Porter's delusions completely prevented him from coming down off his psychotic state into reality and the hours of attempted de-escalation attempts

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

all failed as Porter was impervious to prolonged attempts at de-escalation in that state. Ex. X, pp. 89:9-12; 90:5-7; 91:1-18.

Plaintiff's psychology and crisis negotiation expert, Dr. Mohandie, testified that having stood in the hallway where Porter was shot, described it as tighter and closer than the video conveys. **Ex. Y**, Dr. Mohandie Depo, pp. 169:10-11. Dr. Mohandie also conceded that it is unknown whether Porter would have ultimately surrendered with a more effective trained negotiator or other negotiation tactics, conceding that it is pure speculation on his or anyone's part as that is not what happened. *Id.*, pp. 138:24-139:5; 35:11-36:14.

## III. LEGAL STANDARDS

### 1. Summary Judgment Standards

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. FRCP 56, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23(1986); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). A "genuine" issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit. *T.W. Elec. Serv., Inc. v. Pacific Elec, Contractor Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Disputes as to immaterial issued facts do "not preclude summary judgment." *Lynn v. Sheet Metal Workers Int'l Ass'n*, 804 F.2d 1472, 1478 (9th Cir. 1986). Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). The non-moving party must instead set forth "significant probative evidence tending to support the complaint." *T.W. Elec.*, 8009 F.2d at 630-631.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

When the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. The moving party is not required to produce evidence showing the absence of a material fact on such issues, nor support its motion with evidence negating the non-moving party's claim. *Id.*; *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support its case, the burden shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan*, 929 F.2d at 1409. If the moving party does not have the ultimate burden of persuasion at trial, "that party must produce evidence which either negates an essential element of the non-moving party's claims or that party must show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden or persuasion at trial." *Johnson v. Barr*, 2021 U.S. Dist. LEXIS 183685 at *23 (N.D. Cal. Aug. 24, 2021) (citing *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000)). In responses, the "non-moving party must 'identify with reasonable particularity the evidence that precludes summary judgment.'" *Id.* Conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment. *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). More than the "mere existence of a scintilla of evidence in support of the plaintiff's position" is required, there must be "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

"An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the case." *American International Group, Inc., v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991). A complete failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial. *Celotex*, 477 U.S. at 323. Importantly for this motion, while the court must view the evidence in the light most favorable to the nonmovant, per *Tolan v. Cotton*, 572 U.S. 650, 656 (2014), the Supreme Court has determined that this court must also view the facts "in the light

depicted by the videotape," and/or other uncontradicted evidence, such as audio and video evidence of this interaction. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Given the clear video evidence in this matter, there are no factual issues that prevent summary judgment and/or qualified immunity on this record, especially viewed from the perspective of an officer in this threatening encounter.

**2. <u>Qualified Immunity Standards</u>**

Qualified immunity is a question of law, not fact. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008). The qualified immunity doctrine shields a government official performing discretionary functions from liability for civil damages if the officer's conduct does not violate a "clearly established statutory or constitutional right of which a reasonable person would have known." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018); *White v. Pauly*, 137 S.Ct. 548, 551 (2017). To be "clearly established" the law must be "sufficiently clear' that every 'reasonable official would understand that what he is doing" is unlawful, beyond debate. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *White*, 137 S. Ct. at 551. Qualified immunity takes "into account the real-world demands on officials in order to allow them to act 'swiftly and firmly' in situations where the rules governing their actions are often 'voluminous, ambiguous, and contradictory." *Lees v. Mariscal*, 2022 U.S. Dist. LEXIS 178003, at *22 (N.D. Cal. Sep. 29, 2022) (citing *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009)). An officer is entitled to qualified immunity unless Plaintiffs can point to a "robust consensus of cases of persuasive authority'" making it clear that the officers' use of force in the particular factual circumstances was improper. *al-Kidd*, 563 U.S. at 742. "If an official could reasonably have believed her actions were legal in light of clearly established law and the information she possessed at the time, she is protected by qualified immunity." *Franklin v. Fox*, 312 F.3d 423, 437 (9th Cir. 2002).

"[Q]ualified immunity shields an officer from suit when he makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The law regarding the amount of force that is reasonable must "accommodate limitless factual circumstances." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). "The protection of qualified immunity applies regardless of whether the government officer's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity is an extremely deferential standard that "gives ample room for mistaken judgments by protecting "all but the plaining incompetent or those who knowingly violate the law." *Mullenix*, 136 S. Ct. at 308 (citing *Malley v. Briggs*¸475 U.S. 335, 341 (1986)). In essence, "qualified immunity gives government officials <u>breathing room</u> to make reasonable but mistaken judgments." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (emphasis added). Qualified immunity also shields an officer from suit when he or she decides that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances he or she confronted. See *Brosseau*, at 198 (Citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). Qualified immunity is more than a mere defense to liability, it is "an entitlement not to stand trial or face other burdens of litigation," and "is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). <u>Plaintiffs bear the burden of proving that the right allegedly violated was clearly established at the time of the alleged misconduct.</u> *M.H. v. City of Alameda*, 62 F. Supp. 3d 1049, 1093-94 (N.D. Cal. 2014) (emphasis added).

## IV. <u>LEGAL ARGUMENTS</u>

### A. <u>Ofc. Mejia's Use of Deadly Force Did Not Violate the Fourth Amendment and/or Qualified Immunity Applies</u>

All claims that law enforcement officer have used excessive force – deadly or otherwise – must be analyzed under the Fourth Amendment and its "reasonableness" standard. *Smith v. City of Hemet*, 394 F. 3d 689, 700 (9th Cir. 2005) (citing *Graham v. Connor*, 490 U.S. 386, 395-96 (1989)). *Graham* mandates that "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* For evaluation of the force, courts must consider the facts and circumstances of each particular case, **<u>but the most determinative issue is whether the officer reasonably believed that a suspect posed an immediate threat to the safety of the officer or others.</u>** *Smith*, 394 F.3d at 702 (emphasis added). Notably, officers are not required to "avail themselves of the least intrusive means of responding to an exigent situation; they need only act within the range of conduct [the courts] identify as reasonable." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1992).

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

This standard requires the court to "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the government interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). "[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application … [and] requires 'careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Graham*, 490 U.S. at 396. <u>"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.</u>" *Marquez v. City of Phoenix*, 693 F.3d 1167, 1174 (9th Cir. 2012) (citing *Graham*, 490 U.S. at 396-97) (emphasis added).

"If a suspect threatens the officer with a weapon or if there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used." *Estate of Toribio v. City of Santa Rosa*, 381 F. Supp. 3d 1179, 1187 (N.D. Cal. 2019) (see *Garner*, 471 U.S. at 11-12). Additionally, "[I]f the person is armed – or reasonably suspected of being armed – a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). Officers are entitled to respond with deadly force when a suspect makes threatening gestures. *Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014).

a. <u>Nature and Quality of Intrusion</u>

When an officer discharges his duty weapon at a suspect, the nature and quality of the intrusion amounts to lethal force. *Smith v. City of Hemet*, 394 F.3d 689, 704-07 (9th Cir. 2005). Where the severity of the intrusion is undisputed, as here, "the issue is determining whether the governmental interests at stake were sufficient to justify it." *Vos. v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018). The *Graham* factors relate to the governmental interests involved.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

b. Government Interests are Satisfied (*Graham* factors)

Here, the *Graham* factors weigh heavily in favor of Ofc. Mejia. First, the severity of the crimes at issue are analyzed at the moment of the use of deadly force. At the point of the shooting, officers had a warrant for Porter's arrest, he had also brandished a knife at least twice at officers and then, just milliseconds before the shooting, he was moving towards Ofc. Mejia's location with the large kitchen knife raised, in close proximity to Ofc. Mejia, a potential looming deadly threat. Numerous felony crimes were involved up to the time of the shooting, not to mention that Porter was legally subject to arrest. This factor weighs in favor of Ofc. Mejia.

The next factor of the immediate threat is also satisfied. The most important *Graham* factor is whether the suspect posed an immediate threat to the safety of the officers or others. *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017). "The use of deadly force is only reasonable if a suspect poses a significant threat of death or serious physical injury to the officer or others." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014). To highlight further, the Ninth Circuit reiterated that the relevant question for the purposes of qualified immunity is not whether Porter actually threatened Ofc. Mejia or others, but whether Ofc. Mejia "could reasonably have believed that [he] posed such a threat." *Sabbe v. Washington County Board of Commissioners*, 2023 U.S. App. LEXIS 27553 *43-44 (9th Cir. 2023).

Here, there can be no doubt that Porter was an immediate threat to Ofc. Mejia and officers near him in the room. It is undisputed that Porter had the knife raised in his right hand, in an attack position and began to move towards Ofc. Mejia's location and was only about 10 feet away when Ofc. Mejia fired at Porter. It is undisputed that from the point Porter entered the hallway until the shooting was 7 seconds or less and there was even more compressed time when Porter raised the knife and started to move towards Ofc. Mejia, making this a rapid event. The Supreme Court has already held that the Fourth Amendment does not bar officers confronting an advancing knife-holder "from protecting themselves, even though it meant firing multiple rounds." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 612–13 (2015); *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (Where a weapon is suspected, there must have been a "furtive movement, harrowing gesture, or serious verbal threat" to justify use of deadly force.). At that close proximity and due to

this rapidity and unpredictability, clearly there was probable cause to believe Porter was an immediate threat to officers on the north end of the hall, including Ofc. Mejia.

The third *Graham* factor, whether Porter was actively resisting arrest or attempting to evade arrest by flight, also weighs in favor of Ofc. Mejia. It is undisputed that Porter came into the hall, failed to get on his knees as commanded, then raised the weapon at head level and started to charge down the hall towards Ofc. Mejia. This factor also weighs in favor of Ofc. Mejia.

The Court may also consider the parties' "relative culpability," i.e. which party created the dangerous situation and which party is more innocent. *Espinosa v. City & County of San Francisco*, 598 F. 3d 528, 537 (9th Cir. 2010). In no logical way did Ofc. Mejia or other officers create the deadly encounter. In fact, the shooting came after over 19.5 hours of extensive negotiations to get Porter to surrender, to give his knife to officers and extended police and mental health efforts to coax Porter into the hallway to be taken into custody. This entire incident was Porter's doing.

Another key factor here is the <u>rapidity of the incident and decision-making</u> of Ofc. Mejia. There can be no doubt on this record Ofc. Mejia had to make split second decisions in the upmost tense situation of a non-compliant subject who was armed with a large knife, unsearched and now coming towards him with the knife in the attack position. After the hot gas, Porter came into the hallway and was empty handed, which could indicate he was ready to surrender, but then pulled out the knife, raised it and went towards Ofc. Mejia's location.

Ofc. Mejia is also not charged with being omniscient about Porter's intent. *Elliot v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996) ("[T]he Fourth Amendment does not require omniscience ... Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm – the Constitution does not require that certitude precede the act of self-protection"). Nor does the law charge Ofc. Mejia with having to interpret Porter's rapid movements to divine biomechanical explanations while the incident unfolds in seconds and Porter approaches with a raised knife. *Gonzales v. City of Antioch*, No. 14-cv-04728-KAW, 2015 U.S. Dist. LEXIS 142642, at *37 (N.D. Cal. Oct. 20, 2015). Balancing all of the various factors in this matter, it is clear that Ofc. Mejia's use of deadly force (two quick gunshots) in this rapid encounter was objectively reasonable from a reasonable, law enforcement perspective in the face of the threat.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

c. Qualified Immunity Protects Ofc. Mejia At a Minimum

Even if the Court were to find there was an arguable Fourth Amendment violation, Ofc. Mejia is entitled to qualified immunity. Although it is Plaintiff's burden to provide precedent that put Ofc. Mejia on notice that deadly force was unconstitutional under similar facts, case law supports qualified immunity. In *Hart*, a suicidal man in crisis crossed a yard to within close range of officers in under 5.9 seconds, holding a knife, ignoring the command to drop it and, after a less-lethal taser deployment failed, the officer shot and killed the approaching assailant. *Hart v. City of Redwood City* 99 F.4th 543, 546 (9th Cir. 2024). The Ninth Circuit held that the officers "literally had only seconds to react to a non-responsive man quickly approaching them with a knife," and reversed the district court's denial of qualified immunity. *Id.* at 550. Similarly, in *Napouk*, summary judgment was affirmed because the decedent was "within nine feet and deliberately advancing on the officers with what they reasonably perceived to be a long, bladed weapon." *Napouk* also confirmed that a suspect's pace is "a red herring obscuring the facts that actually matter" where an armed man is deliberately closing on officers with a bladed weapon. *Napouk v. Las Vegas Metropolitan Police Department*, 123 F.4th 906, 918 (9th Cir. 2024). Decisions holding force reasonable on weaker records confirm qualified immunity should apply at a minimum. *See Blanford v. Sacramento County*, 406 F.3d 1110, 1115–19 (9th Cir. 2005) (force reasonable against a man advancing with an edged weapon at roughly ten feet); *See Lal v. California*, 746 F.3d 1112, 1117-1119 (9th Cir. 2014) (deadly force reasonable where distraught man advanced on officers with a rock raised overhead, ignoring commands to drop it); *Sheehan*, 575 U.S. at 612–13 (Officers use of force was reasonable and qualified immunity applied when responding to a mentally ill woman in crisis shot her when, after pepper spray failed, she continued advancing on them with a knife).

Furthermore, in *Kisela*, the Supreme Court granted immunity to an officer who shot a woman holding a kitchen knife while slowly approaching a bystander, identifying *Blanford*, the edged-weapon advance case, as "the most analogous Circuit precedent." 584 U.S. 100, 105–06 (2018). Further, in *S.B.*, the Ninth Circuit granted qualified immunity on facts materially weaker than the admitted advance here: a kneeling man who merely grabbed a knife, without the overhead raise or close-quarters approach. 864 F.3d at 1013–16. Precedent granting immunity on materially

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

weaker facts cannot have placed Ofc. Mejia’s shooting's unlawfulness 'beyond debate.' *Rivas-Villegas*, 595 U.S. at 5–6.

The Supreme Court itself supplied another closes analog to demonstrate qualified immunity here. In *Sheehan*, officers responding to a mentally ill woman in crisis shot her when, after pepper spray failed, she continued advancing on them with a knife; the Court held the officers' use of force reasonable, "[n]othing in the Fourth Amendment barred [them] from protecting themselves, even though it meant firing multiple rounds", and granted qualified immunity. 575 U.S. at 604–05, 612–13. *Sheehan* thus placed a Supreme Court decision before every officer in February 2022: deadly force against that advancing, knife-armed subject was reasonable and immunized. This case is Sheehan with two facts the Court did not even require, an overhead raise and a charge. If the lesser threat in Sheehan justified deadly force, no clearly established law told Detective Mejia to hold fire against the greater one.

Plaintiff bears the burden of identifying pre-incident precedent in which an officer confronting a knife-raised, charging suspect was held to have violated the Fourth Amendment, and none exists. Moreover, courts have highlighted the “broad discretion that must be afforded to police officers who face a tense situation.” *Jeffers v. Gomez*, 267 F. 3d 895, 909 (9th Cir. 2001). “A reasonable use of deadly force encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable.” *Wilkinson v. Torres*, 610 F. 3d 546, 551 (9th Cir. 2010). As the Supreme Court reiterated *this Term*, “officers receive qualified immunity unless they could have 'read' the relevant precedent beforehand and 'know[n]' that it proscribed their specific conduct.” *Zorn v. Linton*, 146 S. Ct. 926, 930-31 (2026). A decision that merely reversed summary judgment because a jury could find excessive force never "held" the conduct unconstitutional and cannot clearly establish law. *Zorn*, 146 S. Ct. at 930–31. As Plaintiff cannot show that Ofc. Mejia violated clearly established law in his use of deadly force in the face of Porter’s approach with the large knife, qualified immunity applies to provide him “breathing room,” at a minimum.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

**B. <u>Plaintiff's Supervisory Claims Fail and/or Qualified Immunity Applies</u>**

Per Plaintiff's Fourth COA, versus Cpt. Wentz, Lt. Hatcher and Sgt. Smith, Plaintiff contends that these supervisors' actions led to the claimed Fourth Amendment unlawful use of deadly force by Ofc. Mejia. ECF 67. While not indicated in the FAC, we assume this is a supervisory claim per Section 1983. At the outset, since Ofc. Mejia did not violate the Fourth Amendment, this claim fails as a matter of law. When the "subordinate officers have not been shown to have violated a clearly established right, it necessarily follows that [their police supervisors] cannot have violated a clearly established right by supervising those officers." *Felarca v. Birgeneau*, 891 F.3d 809, 823 (9th Cir. 2018); *Puente v. City of Phoenix*, 123 F.4th 1035, 1064 (9th Cir. 2024) (supervisory claims "necessarily fail" on summary judgment where the underlying claims fail).

Even if Plaintiff can demonstrate an arguable Fourth Amendment violation, this claim still fails. A supervisor is liable only for his own culpable action or inaction that he "knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011). A supervisor is liable for the acts of his subordinates if the supervisor participated in or directed the violations. *Vazquez v. County of Kern*, 949 F.3d 1153, 1166 (9th Cir. 2020). In other words, Plaintiff can only arguably make out this claim if Plaintiff can demonstrate that these three supervisors knew or reasonably should have known that Ofc. Mejia would deploy unlawful deadly force in this encounter, which is a fantastical and wholly unsupported theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 675-77 (2009). Deadly force only came in the final seconds of an almost twenty hour negotiation with Plaintiff, about eleven plus hours after the SWAT team and Ofc. Mejia, arrived on scene. Clearly Ofc. Mejia would not have used deadly force if Porter peacefully surrendered earlier, or threw his knife out of the port hole or came out of the room unarmed. In fact, all the evidence in the record demonstrates the back breaking and exhaustive efforts of these three supervisors to bring this matter to a peaceful result without any injuring force, but Porter had other ideas when he exited the room, presented the knife and moved northward.

There is absolutely no evidence that will be in the Court's record that these three supervisors' actions in any way, shape or form led to any claimed unlawful use of deadly force.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

While it is clear Plaintiff wants to argue that the use of the "hot gas" forced Plaintiff out of the room and into a deadly encounter, this is flawed reasoning. First of all, there was probable cause for Porter's arrest, prior less invasive chemical irritants failed to get Porter to come out and officers could use force to flush out Porter as he was arrestable. Secondly, officers spent hours and hours to convince Porter to relinquish the knife, but Porter instead chose to come into the hallway and present the knife, raise the knife as he started to move north. It is logical to believe that deadly force would not have been used towards Porter if he had followed commands to get down and on knees in the hall and/or had not come out and presented a knife. This claim does not allow for vicarious liability towards supervisors and Plaintiff cannot satisfy his evidentiary burden here.

Even if Plaintiff can somehow conjure up evidence to arguably support this claim, these supervisors are entitled to qualified immunity in this incident as they did not violate clearly established law, beyond all debate. For Plaintiff to meet their burden to prove an arguable violation of clearly established law, Plaintiff would have to demonstrate a case or consensus of cases showing that supervisors, who worked hard over eleven hours to peacefully resolve an armed barricaded subject, providing numerous commands, were responsible for a shooting at the end of the encounter. No such cases exist to put these supervisors on notice and Plaintiff cannot rely upon generalized case law to try to counter these qualified immunity arguments. *City of Escondido v. Emmons*, 586 U.S. 38, 42–43 (2019) (per curiam) (reversing the Ninth Circuit for defining the clearly established right against a non-shooting supervising officer "at a high level of generality"). As such, even if an arguable supervisory liability claim can be shown, qualified immunity applies to immunize these three supervisors for Ofc. Mejia's sudden and proper deadly force.

### C. Plaintiff's *Monell* Failure to Supervise Claim Also Fails

Plaintiff has a similar failure to properly supervise *Monell* claim against the City and Chief Addington per the Third COA, though this claim also is unsupported and subject to summary judgment. First of all, Chief Addington was not involved in this hotel incident and is only named for this claim as the final policy maker for the PPD. Secondly, this claim also fails on its face since Plaintiff cannot demonstrate any underlying Fourth Amendment violation by Ofc. Mejia. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (a municipality cannot be liable where its officer

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

"inflicted no constitutional harm."). Even if Plaintiff can hurdle these burdens, this claim fails.

A failure to supervise theory (like failure to train) ordinarily requires "[a] pattern of similar constitutional violations by untrained employees." Incidents "not similar to the violation at issue" cannot supply notice of the specific deficiency alleged, and deliberate indifference is "a stringent standard of fault." *Connick v. Thompson*, 563 U.S. 51, 61–63 (2011); *Trevino v. Gates*, 99 F.3d 911, 917–18 (9th Cir. 1996). Such a pattern must have led to the shooting of Porter per the allegations here of an unlawful use of deadly force, but Plaintiff simply cannot meet that burden.

Instead, Plaintiff seems to rest this theory on allegations of other incidents/lawsuits involving the PPD, most not involving Ofc. Mejia, many of which do not even involve the use of deadly force. See ECF 67, ¶ 53(a)–(i), at pp. 14–16 (lawsuits spanning 2016 to 2020, including matters allegedly arising from tasings, a canine deployment, baton strikes, a warrantless vehicle search, and retaliatory arrests). These are unverified and are insufficient to prove this theory, nor do they involve Ofc. Mejia. Even if Plaintiff has proof that Ofc. Mejia was involved in another encounter, which did not involve a shooting, such evidence is wholly insufficient to be able to prove that such failure to supervise Ofc. Mejia years prior led to the shooting of Porter. Overall, this claim fails as well.

**D. <u>Plaintiff's ADA Claim Against the City Fails As Well</u>**

Plaintiff's Second COA relates to a purported ADA claim against the City. "Title II of the ADA applies to arrests." *Hyer v. City & County of Honolulu*, 118 F.4th 1044, 1065 (9th Cir. 2024). The Ninth Circuit recognizes two types of Title II ADA claims in the arrest context: wrongful arrest, where police misperceive the effects of a disability as criminal activity, and reasonable accommodation, where police fail to accommodate a known disability during an otherwise proper investigation or arrest. *Sheehan v. City & County of San Francisco (Sheehan I)*, 743 F.3d 1211, 1232 (9th Cir. 2014), rev'd in part on other grounds sub nom. *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600 (2015). The wrongful-arrest theory has no application here as officers did not mistake Porter's disability for crime and had a lawful arrest warrant for his arrest as well, the legality of which Plaintiff does not challenge in this case. The reasonable-accommodation theory therefore governs, where "the plaintiff bears the initial burden of producing evidence of the

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

existence of a reasonable accommodation," and the public entity may prevail by showing that the proposed modification was unreasonable under the circumstances and/or was provided. *Sheehan I*, 743 F.3d at 1232–33. A reasonable accommodation of a mentally ill person, in the arrest context, could include the use of a throw phone or a crisis negotiation team. *Hyer*, 118 F.4th at 1066.

Here, there is no evidence that City personnel failed to accommodate any known disability. The record is replete with evidence showing 19.5 hours of negotiations for Porter's peaceful surrender, including the use of PPD negotiators, County mental health personnel, family and friends of Porter as well, to try to resolve this incident short of any force, let alone deadly force. The record shows that City personnel used exhaustive negotiations and tactics to try to get Porter safely into custody, which failed at all turns. The PPD then used escalating less lethal force options, followed by continued hours of negotiations to try to resolve this short of deadly force, all of which failed. Even if this claim can even get off the ground, all the evidence indicated that PPD officers bent over backwards to try to resolve this peacefully, but then deadly force was necessary due to Porter's actions once he was finally out of his barricaded room. Porter cannot make out any ADA claim in this case so this claim is subject to summary judgment.

### E. <u>Plaintiff's State Claims Are Also Subject to Summary Judgment</u>

#### 1. <u>Plaintiff's Bane Act Claim Fails</u>

For the Bane Act claim (California Civil Code § 52.1), Porter must show that Ofc. Mejia and others interfered with the exercise of an individual's rights secured by the Constitution by "threat, intimidation, or coercion." *Austin B. v. Escondido Unified Sch. Dist.*, 149 Cal.App. 4th 860, 880-81 (2007). Importantly, the Bane Act claim requires an additional intent element. *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1044-45 (9th Cir. 2018) (Because the trial court's Bane Act instruction did not require inquiry into the officer's intent, it was error.); *Cornell v. City & County of San Francisco* (2017) 17 Cal.App.5th 766, 790-804 (California courts have held that the "threat, intimidation or coercion" and/or violence element requires a specific intent to violate protected rights.). "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., "threats, intimidation or coercion"), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she



6657729

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

was not required to do under the law." *Austin B.*, 149 Cal. App. 4th at 883 (citing *Jones v. Kmart Corp.*, (1998) 17 Cal.4th 329, 334.)

Here, there is no evidence of any specific intent to violate Porter's rights. Rather, all the evidence indicates that officers worked tirelessly to try to gain Porter's peaceful surrender short of any force and then when choosing force options in terms of chemical irritants, officers used escalating options followed by continued negotiations until the "hot gas" worked to get Porter out. Plaintiff cannot demonstrate evidence to support the intent based Bane Act claim.

**2. Plaintiff's Negligence Claim Is Wholly Unsupported**

The elements of a negligence cause of action are: (1) a legal duty to use due care; (2) a breach of that duty; (3) the breach was the proximate or legal cause of the resulting injury; and (4) actual loss or damage resulting from the breach of the duty of care. *Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917 (1996). In the context of a use of force or deadly force, Plaintiffs "must prove unreasonable force as an element of the tort." *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272 (1998). "A police officer's use of deadly force is reasonable if the officer has probable cause to believe that the suspect poses a significant threat of death of serious physical injury to the officer or others." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 528 (2009). This claim is similar to the Fourth Amendment analysis in terms of whether the force was reasonable. *Hayes v. Cty. Of San Diego*, 57 Cal. 4th 622, 639 (2013). The reasonableness of an officer's actions are evaluated in light of the totality of the circumstances and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 632 (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).

Admittedly, California law is "broader than federal Fourth Amendment law" because it includes consideration of an officer's conduct prior to the moment when force is applied, known as pre-shooting tactics. *Id.* at 632, 639-640; *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125 (9th Cir. 2021). Importantly, "California law does not require officers to 'choose the most reasonable action or the conduct least likely to cause harm," instead, "law enforcement personnel have a degree of discretion as to how they choose to address a particular situation." *J.A.L. v. Santos*, 724 F.Appx. 531, 534 (9th Cir. 2018). Notably, because pre-shooting conduct matters only as "part

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

of a continuum of circumstances surrounding a single use of deadly force," a court may not "divide plaintiff's cause of action artificially into a series of decisional moments" and permit each to be litigated in isolation. *Hayes*, 57 Cal. 4th at 639. Further, negligence cannot be demonstrated when officers are methodical and "engaged in reasonable exercises of judgment" in their pre-shooting conduct. *Smith v. Cnty. Of Butte*, U.S. District LEXIS 65335 *5 (E.D. Cal. 2017). Also in California, officers may use reasonable force to make a lawful arrest or detention, prevent escape or overcome resistance, and need not desist in the face of resistance, per P.C. § 835a.

Here, as indicated in detail above, Ofc. Mejia's controlled two rapid gunshots in the face of an objective deadly threat posed by Porter was reasonable, meaning Plaintiff's negligence claim fails on that basis. To the extent Plaintiff tries to argue that the pre-shooting tactics by involved officers made this a negligent shooting, those claims also fail. It cannot be stressed enough that Porter was subject to arrest per the warrant and officers then still spent over twelve hours trying to negotiate with him to come out, all of which failed. This record is entirely clear that the PPD officers were the opposite of heavy handed with Porter as they were patient, steady and tried at all turns to resolve this encounter without any force. Plaintiff cannot show any tactics that were obviously negligent that led and caused this shooting. Despite a plethora of likely forthcoming claimed criticisms, it was solely Porter's actions that led to this shooting.

**3. <u>Plaintiff's Battery Claim Also Fails</u>**

Per California law, a claim for battery by a peace officer requires proof that the officer used unreasonable force. *Edson v. City of Anaheim*, 63 Cal.App.4th 1269, 1271–72 (1998); *Nelson v. City of Davis*, 709 F.Supp.2d 978, 992 (E.D. Cal. 2010). The standard for evaluating whether force is unreasonable is the same as under the Fourth Amendment: courts must consider the totality of the circumstances from the perspective of a reasonable officer on the scene. *Graham*, 490 U.S. at 396–97. Notably, the battery claim does not include a requirement to analyze the pre-shooting tactics, but only analyzes the issue per the moment of the threat in the hallway.

Here, as demonstrated extensively herein, the use of deadly force was reasonable under the totality of circumstances facing Ofc. Mejia. In milli-seconds, Ofc. Mejia had to decide how to react when Porter defied commands to get on the ground or his knees, then presented a knife from his

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

sweatshirt, then raised the knife in the attack position and started to move in Ofc. Mejia's direction. This claim fails as ll the evidence indicates that Ofc. Mejia acted within the spectrum of reasonableness in his use of deadly force to stop Porter's threatening actions, for himself and others.

### 4. <u>Immunities Protect From Claims Per State Law</u>

For the state claims, Defendants also have immunity under California law per several statutes, namely: (1) immunity for all injuries caused by a person resisting arrest (Gov. Code § 845.8(b)); (2) immunity for exercising due care (Ca. Gov. Code § 820.4). If Ofc. Mejia is immune, then the City is immune as well per Cal. Gov. Code § 815.2.

Per Cal. Gov. Code § 845.8(b), neither a public entity nor public employee is liable for any injury caused by a person resisting arrest or trying to escape. *Kisbey v. State of California*, 36 Cal. 3d 415 (1984); *Hooper v. City of Chula Vista*, 212 Cal. App. 3d 442 (1989). Here, Porter was clearly resisting officers when he came out of room, did not get on the ground as commanded and then raised the knife and started to move towards Ofc. Mejia's direction, which was resistance or an attempt to escape, Defendants to immunity per this statute.

Further, per Ca. Gov. Code § 820.4, immunity applies as the evidence shows that Ofc. Mejia used "due care" and was not negligent in his use of deadly force in self-defense or defense of their fellow officers. A public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law. Gov. Code § 820.4. "Due care" under § 820.4 "refers to acts and omissions by a public employee that are not negligent." *Harb v. City of Bakersfield*, 233 Cal. App. 4th 606, 620 (1974). Further, "due care" is essentially the same under a negligence claim as it is per § 820.4. *Sullivan v. County of L.A.*, 12 Cal. 3d 710, 717, (1974) (describing § 820.4 as an "immunity for public employees for their non-negligent acts in the execution or enforcement of any law…"); *Harb*, 233 Cal. App. 4th at 619-20. As stated in detail herein, there is no evidence that Ofc. Mejia's split-second actions to use deadly force in self-defense or defense of his fellow officers was unreasonable and, in fact, it was a lawful use of deadly force. Ofc. Mejia used due care in his attempt to take Porter into custody, as he was subject to arrest, so this immunity applies as well. Overall, even if Plaintiff can make out any viable state claim, these immunities protect Defendants from these state law claims. In sum, all of Porter's claims are subject to summary judgment.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

The undersigned attests that permission in the signing of this document(s) has been obtained from the signatories below which shall serve in lieu of the actual signatures on the document(s).

Dated: July 16, 2026

MCNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP

By: /s/ Noah G. Blechman
Noah G. Blechman
John J. Swafford
Attorneys for Defendants
CITY OF PITTSBURG; BRIAN ADDINGTON; WILLIAM HATCHER; CORY SMITH and PATRICK WENTZ

Dated: July 16, 2026

CASTILLO, MARIARTY, ROBINSON, LLP

By: /s/ John R. Robinson
John B. Robinson
Attorneys for Defendant
ERNESTO MEJIA-OROZCO